[No. 20667–2–I.  Division One.  August 14, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. LARRY
FRAZIER, *Appellant.*

*Lenell Nussbaum* of *Washington Appellate Defender
Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Patricia Shelledy, Cynthia S.C. Gannett,* and *Peter Goldman, Deputies,* for respondent.

SWANSON, J.—Larry Frazier appeals from the judgment and sentence entered following his conviction for third degree assault. Frazier contends that the trial court erred in refusing to give his proposed "no–duty–to–retreat" instruction and in limiting the scope of closing argument.

This appeal arose from a domestic altercation on March 3, 1987, between appellant Frazier, a former professional heavyweight boxer, and his ex–wife Ellen. Frazier was charged by information filed March 5, 1987, with second degree assault. The information alleged that Frazier had knowingly inflicted grievous bodily harm on Ellen "with a weapon and other instrument likely to produce bodily harm, to wit: his fists." Trial began on May 4, 1987.

Larry and Ellen Frazier were married in 1978 and divorced in 1981. The couple acknowledged that they were always fighting and that there had been a lot of "bad blood" in their relationship. Following their divorce, the couple continued to live together intermittently. Most recently prior to the charged incident, Frazier had moved in with Ellen in November 1986.

For several weeks prior to the March 3 incident, Ellen asked Frazier to move out. Frazier agreed, but apparently took no action until the evening of March 2, 1987, when he packed his suitcases. On the morning of March 3, Frazier left the house to visit a friend who owned a rooming house. He returned at about noon and called an aunt in California to ask for a bus ticket to California. At this point, things began "heating up." While Frazier talked on the telephone, Ellen "said a whole lot, fussing, cussing, screaming; you know, just mad, telling him to get out, just leave me alone, just get out." Then, according to Ellen, Frazier "got mad, just stood up, bam, hit me [with] [h]is fist" on the mouth.

Ellen fell back on the couch and grabbed a 40–ounce "Louisville Slugger" baseball bat that she had owned since she was a young girl. She then hit Frazier several times on the legs with the bat. After retrieving the bat from Ellen, Frazier punched her several more times, causing substantial injuries to her face, head, and shoulders. Ellen called the police, but Frazier had left by the time they arrived.

Ellen acknowledged that she had used the bat on Frazier once before to "po[p] his head," in 1982 or 1983, even though Frazier had not threatened her:

> He was sitting in the living room playing music. And I had just got off from work, and it was like three or four in the morning, and he just kept turning it up. He had been drinking. And, you know, I asked him three or four times to turn it down, and I got up and said I wasn't getting up no more to turn it down, turned it back up, and I just got the bat and wham.

Frazier went to the hospital the following morning, where he received 16 stitches on his head.

Frazier's depiction of the incident was similar to Ellen's up to the time of the telephone call. According to Frazier, while he was talking on the telephone to his aunt in California to arrange a bus ticket, Ellen said, "You mother fucker, I'm gonna kill you" and picked up the baseball bat in the corner. Ellen then walked over to him, swung the bat "[l]ike hitting a softball," and "popped me across my legs, boom." In response, Frazier grabbed for the bat and threw "between three and four left hooks." One of the punches missed, and he hit a protruding window frame, severing several tendons in his hand. At this point, it "was all over," and Ellen's brother entered the room.

Frazier left the house and eventually went to Harborview Hospital, where his injured hand was treated. When police later contacted him at a neighbor's house, the appellant initially denied that his name was Larry Frazier. After police looked through his identification, Frazier was arrested.

Ellen Peay, known as "Peaches Davenport," testified that she had known both Larry and Ellen for over 10 years.

Peay stated that she had seen Ellen at a neighbor's house several days after the assault and that Ellen was "drinking [and] laughing" about the incident. According to Peay, Ellen said that Frazier assaulted her because she had struck him on the head with a bat. Peay further stated that Ellen was known in the neighborhood as a "big liar."

The trial court instructed the jury on self–defense and on the definition of necessary force, but refused to give the defendant's proposed "no–duty–to–retreat" instruction. Following 2 days of deliberations, the jury found Frazier guilty of the lesser included crime of third degree assault.

Appellant first contends that the trial court erred in refusing to give a "no–duty–to–retreat" instruction. Relying on *State v. Allery,* 101 Wn.2d 591, 682 P.2d 312 (1984), counsel for Frazier proposed the following instruction:

> It is lawful for a person who is in a place where he has a right to be, who has reasonable grounds for believing he is being attacked, to stand his ground and defend himself from such attack. He need not attempt to retreat.

In *Allery,* the defendant entered her house and unexpectedly encountered her estranged husband, who threatened to kill her. After unsuccessfully attempting to escape through a bedroom window and hearing what she thought was her husband getting a knife from the kitchen, the defendant shot her husband while he lay on the couch. *Allery,* at 593. After determining that the trial court's self–defense instruction was inadequate because it failed to instruct the jury to consider conditions as they appeared to the defendant and that the trial court had erred in excluding testimony regarding battered woman syndrome, our Supreme Court also held that the trial court had erred in refusing to give the defendant's no–duty–to–retreat instruction. *Allery,* at 598.

Appellant's argument implies that a no–duty–to–retreat instruction is necessary in every case in which there is sufficient evidence to support a self–defense instruction. This court, however, recently declined to construe *Allery* so broadly. In *State v. Thompson,* 47 Wn. App. 1, 733 P.2d

584, *review denied*, 108 Wn.2d 1014 (1987), the defendant was convicted of manslaughter and assault following a shooting incident. On appeal, the defendant assigned error to the trial court's refusal to give a no–duty–to–retreat instruction and to an instruction defining "necessary" as it pertained to the use of force. We distinguished *Allery* and rejected the defendant's claim that the trial court should have given a no–duty–to–retreat instruction. After noting that the instruction in *Allery* was critical to the defendant's theory of "battered woman syndrome," *Thompson,* at 6, we observed the neither side had raised the issue of retreat and that Thompson's own testimony was that he was actively retreating at the time of the shooting, rendering a no–duty–to–retreat instruction superfluous. *Thompson.*

■ Despite some difference in the facts, we find *Thompson* persuasive here. The primary issue below was the identity of the initial aggressor. As in *Thompson,* whether the defendant should have retreated was simply not an issue. In addition, the trial court's unchallenged self–defense instruction in the instant case implied that the defendant did not have a duty to retreat.[1]

Appellant has not contended that the instructions as given were insufficient to permit him to argue his theory of the case. Nor has he identified any evidence raising a retreat issue. Rather, he claims that the absence of the no–duty–to–retreat instruction might have produced a "compromise" verdict because of "some belief" that he could have retreated if his ex–wife, in fact, had been the initial aggressor. Given the nature of the issues and the evidence

---

[1]The jury was instructed on self–defense as follows:

"The use of force upon the person of another is lawful when used by a person who reasonably believes that he is about to be injured by someone, and when the force is not more than is necessary.

"The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

"The State has the burden of proving beyond a reasonable doubt that the force used by the defendant was not lawful."

presented, however, we find no basis for such speculation. The trial court therefore did not err in refusing to give the proposed instruction.[2]

The appellant next challenges two rulings by the trial court during closing argument that involved (1) the State's failure to produce evidence of "Peaches Davenport's" convictions; and (2) the State's failure to call Calvin Bell as a witness.

### "PEACHES DAVENPORT'S" CONVICTIONS

As already indicated, Ellen Peay, known as "Peaches Davenport," testified that Ellen had admitted initiating the altercation by hitting Frazier in the head with the baseball bat and that Ellen was known in the neighborhood as a "big liar." During cross examination, Peay acknowledged that she had some problems with "the law" and volunteered the fact that "the jury found me not guilty." The deputy prosecutor then asked—without objection—a series of questions as to whether she had ever been convicted of assault, property destruction, or "menacing." Peay consistently maintained that she had never been convicted and that the jury had acquitted her. No further evidence of the alleged convictions was presented.[3]

During appellant's closing argument, the following exchange occurred, to which appellant has assigned error:

> His record as a boxer, is that relevant? No, it isn't. Another thing was when the defense brought in a witness, Peaches, the State was asking Peaches and trying to get you to believe that this woman had criminal convictions, and asked not just one question, but several questions about that. Don't you think

---

[2]We decline the State's invitation to follow decisions in other jurisdictions that have suggested that a no–duty–to–retreat instruction is *never* required when the jury has been properly instructed on self–defense. *See, e.g., State v. Jessen,* 130 Ariz. 1, 633 P.2d 410 (1981).

[3]In its brief, the State disingenuously maintains that the evidence of Peay's prior conviction would not have been admissible pursuant to ER 609, but fails to reveal the evidentiary basis of its cross examination. The State's failure to produce proof when a witness denies the existence of a prior conviction was condemned in *State v. Beard,* 74 Wn.2d 335, 444 P.2d 651 (1968); *see also State v. Dixon,* 17 Wn. App. 804, 565 P.2d 1207, *review denied,* 89 Wn.2d 1012 (1977).

that because the State has the burden to prove their case that if there had been any evidence whatsoever that person had a criminal conviction that it would have come in?

[PROSECUTOR]: Objection, your honor.

THE COURT: I think we'll sustain it for safety sake. It might invite rebuttal. Or perhaps the jury can disregard this matter of convictions.

[DEFENSE COUNSEL]: *At any rate we know that there was no evidence produced to substantiate the questions that were asked in that area.*

(Italics ours.)

█ Appellant maintains that the trial court erroneously prevented him from arguing that the State had failed to produce any evidence of Peay's convictions. Although the precise basis for the State's objection and the trial court's ruling is unclear from this brief exchange, it appears that the trial court was concerned about the argument leading into areas of potential confusion and irrelevance. The challenged portion of defense counsel's argument connected the State's burden of proof to its failure to produce a specific piece of evidence, thereby implying that the State had a legal duty to produce the evidence. Such an assertion, as the trial court recognized, invited a potentially confusing response from the State. More important, as the emphasized passage reveals, defense counsel was in fact permitted without objection to underscore the absence of evidence on this subject and invite the jury to draw reasonable inferences from this absence. Appellant has not identified any additional argument defense counsel might have desired to make on this question.

Because the trial court did not preclude counsel from arguing about the inferences to be drawn from the absence of proof of Davenport's convictions, no error was involved in this portion of the closing argument.

### CALVIN BELL'S TESTIMONY

Appellant testified without objection that he had told Calvin Bell, Ellen's brother, who entered the room just

after the altercation, that Ellen "attacked me with a baseball bat." During closing argument, the following exchange occurred:

> And I submit to you that what Larry says does make sense. In other words, first, he has consistently said the exact same thing to every single person that he has talked to. He said that, "Ellen attacked me with the bat," to Calvin Bell, Ellen's brother. Now, do you think that if he hadn't said that to Calvin that the State wouldn't bring that witness in here and tell you that?
>
> [PROSECUTOR]: Objection, Your Honor.
>
> [DEFENSE COUNSEL]: Your Honor, I would—
>
> THE COURT: It's just as well we avoid evidence that wasn't produced.
>
> [DEFENSE COUNSEL]: Your Honor, at this point I would indicate that the law does say that the State has—
>
> [PROSECUTOR]: Objection, Your Honor. There is no law in the jury instructions on this.
>
> THE COURT: Yes, I know. I'm going to sustain it, anyway.
>
> [DEFENSE COUNSEL]: He told the exact same thing to the police officers every time he was questioned. He told the exact same thing to Peaches, and he said the exact same thing that, "Ellen attacked me with a bat."

Appellant maintains that the trial court once again improperly prevented him from arguing reasonable inferences to be drawn from the absence of evidence and that the trial court's statements constituted a comment on the evidence.

Although the precise basis for the challenged ruling is obscure, it appears that the trial court sustained the objection at least in part out of a concern that counsel was attempting to argue on the basis of the "missing witness" rule, a theory not submitted to the jury. Although defense counsel apparently submitted a proposed "missing witness" instruction, no objection was raised to the trial court's failure to instruct on this theory.

When a party fails to produce a particular witness or specific evidence when it would be natural to do so, an inference arises that the testimony or evidence would be unfavorable. 5 K. Tegland, Wash. Prac., *Evidence* § 85.4, at 247 (3d ed. 1989). However, in order to invoke the "missing witness" rule, a criminal defendant

must establish such circumstances which would indicate, as a matter of reasonable probability, that the prosecution would not knowingly fail to call the witness in question unless the witness's testimony would be damaging. In other words, "the inference is based, not on the bare fact that a particular person is not produced as a witness, but on his non–production *when it would be natural for him to produce the witness if the facts known by him had been favorable.*"

*State v. Davis*, 73 Wn.2d 271, 280, 438 P.2d 185 (1968) (quoting 2 J. Wigmore, *Evidence* § 286 (3d ed. 1940)). No inference arises when the witness is unimportant or the testimony cumulative. *See, e.g., State v. Dickamore*, 22 Wn. App. 851, 856, 592 P.2d 681 (1979).

Here, defense counsel asked the jury to infer that Calvin Bell's testimony would have been favorable to the defense, *i.e.*, he would have confirmed what Frazier said after the altercation. By emphasizing the inferences to be drawn from the State's failure to produce a specific witness on rebuttal, defense counsel's argument came uncomfortably close to invoking the "missing witness" rule.

The trial court has broad discretion to control the scope of closing argument. *See State v. Cecotti*, 31 Wn. App. 179, 183, 639 P.2d 243, *review denied*, 97 Wn.2d 1020 (1982). Its apparent decision to prevent further development of counsel's argument in the direction of the missing witness rule, absent a proper instruction, was not an abuse of discretion.

Moreover, even if the trial court's ruling was erroneous, the error was harmless. Calvin Bell's testimony was of little significance, since he did not witness the crime. Any inferences to be drawn from his failure to testify, whether he would have confirmed what Frazier said *after* the crime or not, would have been of scant persuasive force for either side. Therefore, any lack of an opportunity to develop this topic further during closing argument could not, with any reasonable probability, have affected the outcome of the trial. Counsel was permitted to argue without objection that Frazier's accounts of the assault to Calvin Bell and to others were consistent.

■ Finally, the trial court's elliptical reference did not constitute an improper comment on the evidence in violation of article 4, section 16 of the Washington State Constitution because it cannot be characterized as having indicated to the jury "a personal opinion or view of the trial judge regarding the credibility, weight or sufficiency of some evidence introduced at the trial." *State v. Owen,* 24 Wn. App. 130, 134, 600 P.2d 625 (1979). *Kirkland v. O'Connor,* 40 Wn. App. 521, 698 P.2d 1128 (1985), relied upon by Frazier, is inapposite, as it involved a jury instruction that suggested the jury was not to consider a lack of evidence regarding a material element of the crime.[4]

Judgment affirmed.

SCHOLFIELD and FORREST, JJ., concur.

Review denied at 113 Wn.2d 1024 (1989).

---

[4]Frazier argues, in effect, that he was entitled to argue the "missing witness" inferences, even without an appropriate instruction, on the basis of the reasonable doubt instruction. No relevant authority is cited to support this assertion. Such a proposition would effectively render the "missing witness" rule nugatory.